**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

NANCY LAMBERT,                     )
                                   )
                                   )
            Plaintiff,             )
                                   )   No.  03 C 3330
      v.                           )
                                   )
PEM-AMERICA, INC.,                 )        HONORABLE DAVID H. COAR
                                   )
                                   )
            Defendant.             )

## MEMORANDUM OPINION AND ORDER

Before this Court is Defendant Pem-America, Inc.'s ("Defendant" or "Pem-America") motion for

partial summary judgment, which requests that this Court: (1) grant Pem-America's first

counterclaim for a declaratory judgment;  (2) dismiss Plaintiff Nancy Lamberts's ("Plaintiff" or

"Lambert") first claim for a declaratory judgment; (3) grant, in part, Pem-America's second

counterclaim for conversion; and (4) dismiss Plaintiff's claim for breach of contract.  For the

reasons set forth below, Pem-America's motion for partial summary judgment is GRANTED in

part and DENIED in part.


## I.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if, "the pleadings, depositions, answers to

interrogatories and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." Schuster v. Lucent Technologies, Inc., 327 F.3d 569, 573 (7th Cir. 2003). (quoting Fed. R. Civ. P. 56(c)).

When evaluating a motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party and makes all reasonable inferences in her favor. See Haywood v. Lucent Technologies, 323 F.3d 524 (7th Cir. 2003). The Court accepts the non-moving party's version of any disputed facts, but only if those facts are supported by relevant, admissible evidence. Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir. 1996).

The moving party has the burden of demonstrating genuine issues of material fact for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995). If the moving party meets this burden, the non-moving party must set forth specific facts that demonstrate the existence of a genuine issue of material fact for trial. Rule 56(e); Celotex, 477 U.S. at 324. To successfully oppose the motion for summary judgment, the non-moving party cannot rest on the pleadings alone but must designate specific facts in affidavits, depositions, answers to interrogatories, or admissions that establish that there is a genuine triable issue. Selan v. Kiley, 969 F.2d 560, 564 (7th Cir. 1992).

## II. FACTS[1]

The dispute between Lambert and Pem-America arises from the United States Copyright Act, 17 U.S.C. § 101 *et seq.* The Parties contest whether, pursuant to 17 U.S.C. § 201, Lambert or Pem-America owns the copyrights for more than 1,000 soft home products, including quilts,

---

[1] Unless otherwise noted, all facts are taken from the Parties' Local Rule 56.1 materials.

throw pillows, window treatments and bed skirts. (hereinafter referred to as the "Quilts" or

"Designs"). The relevant facts to that inquiry are discussed herein.

### A. Lambert is Hired by Pem-America

Pem-America is a New York corporation in the business of designing and importing

home textiles, including quilts and related products, for distribution and sale in the United States.

On October 1, 1999, Pem-America hired Lambert, an experienced bedding textile designer, as

its Vice-President of Design. The Parties' business relationship was mandated by the

"Employment Contract for Pem America," a document drafted by Plaintiff on September 21,

1999. The agreement, in relevant part, states:

> Employment Contract for Pem America
> submitted by Nancy Lambert on September 21, 1999
> This is a full time permanent position except that Nancy Lambert will continue her work relationship with Big Sky Carvers.[2] This position provides an opportunity for Nancy Lambert to help grow Pem America, a company with a solid foundation, in a working partnership with Waug (sic) Ji.
> A. Job Title
> The job title for this position is Vice President of Design
> B. Duties and Goals
> 1. Help the company grow the business by 3 million dollars at the end of two years.
> 2. Assist Waug (sic) Ji with planning and developing the business in all aspects.
> C. Compensation Packages
> Salary of $130,000 per year.
> D. Benefits Packages
> 1. Nancy Lambert will receive all of the benefits granted to employees of the company.
> 2. Contract and salary review at the end of two years of employment.

---

[2] Plaintiff discontinued all work for Big Sky Carvers approximately one year after she began working with Pem-America, after which she worked exclusively for Pem-America. Plaintiff has testified that she earned approximately $2500 for one year of work for Big Sky Carvers. See Def. Decl., Tab 1, p. 618, lines 15-19. However, the Internal Revenue Service Form 1099 states that Lambert earned approximately $4500 in one year of work for Big Sky Carvers. See Def. Decl, Tab 3.

E. Expenses to be Paid by the Company
Business expenses approved by Waug (sic) Ji will be submitted monthly, on an
expense report, and paid by the company.
F.  Trend Resources
Trend resources will be evaluated and approved by Waug (sic) Ji.
G.  Travel
Travel domestically, as per company policy.  Travel overseas, business class.

See Def. Decl., Tab 2[3]


### B.  Lambert's Work/Studio Space

During the first few months of working for Pem-America, Lambert used the studio office space in her Hawthorn Woods, Illinois home.  However, by February 2000, Lambert's workload had grown so that her work for Pem-America consumed all available space in her home, and she needed additional space.  Consequently, Lambert contends (although Defendant disputes this fact), that Lambert asked Wang Ji, Defendant's president and owner, for Pem-America to pay for the lease of office/studio space.  Wang Ji refused Plaintiff's request.  As a result, Lambert and her husband Jeff used $80,000 of their own funds to purchase studio space in Mundelein, Illinois (hereinafter referred to as "the Studio").   Lambert and her husband continued to pay all of the expenses of the Studio until approximately July 1, 2000, when Pem-America began to pay the rent of the Studio, as well as other related expenses.  (See Def. Decl., Tab1, (Lambert Dep., p. 623, lines 2-7)).[4]  Pem-America continued to pay all of the expenses for the Studio from

---

[3]"Def. Decl."  refers to Declaration of Ashima Aggarwal in Support of Defendant's Motion for Partial Summary Judgment and all exhibits attached thereto.

[4]Plaintiff's deposition testimony is part of the record from the action entitled Pem-America, Inc. v. Sunham Home Fashions, LLC, Case No. 03 CV 1377, which is before Judge John F. Keenan of the United States District Court of the Southern District of New York (hereinafter referred to as "the Sunham action").  Soon after Lambert's resignation, she testified on behalf of defendant Sunham Home Fashions, LLC.  Pem-America's cause of action

approximately July 2000 until Lambert's resignation on February 15, 2003, with the exception of some computer equipment, computer programs and furniture that Lambert purchased yet was never reimbursement for.  (Id. at ln. 17-25).

In communications with other company personnel, and with Pem-America's vendors, manufacturers and customers, Lambert occasionally referred to her Mundelein Studio as "Pem-America Chicago."   Additionally, the telephone number for the Studio was listed under the name of Pem-America Chicago.[5]   Further, on a regular basis, Plaintiff received mail at the Studio addressed to "Nancy Lambert, Pem-America.."  In addition, Jeff Lambert created an email address for Nancy Lambert, nancylambert@pemamerica.com, and also created an intranet address, www.pemamerica.intranets.com.  Finally, Jeff Lambert created letterhead which Nancy Lambert used, without instruction from Pem-America, in the name of "Pem-America Chicago" or "Pem-America–Chicago Studio."

---

against Sunham Home Fashions concerns claims asserted by Pem-America that Sunham infringed Pem-America's copyrighted "Velvet Garden" design, one of the designs at issue in the cause of action before this Court.  During the preliminary injunction hearing in the Sunham action, which occurred in May and June of 2003, Lambert testified that she authored the "Velvet Garden" design, and that she was an independent contractor for Pem-America, so copyright in the design vested to her benefit.  Judge Keenan issued a preliminary injunction in Pem-America's favor, and discredited Plaintiff's testimony, and stated that Lambert's testimony that she authored "Velvet Garden" was "not convincing."  Judge Keenan's decision in the Sunham action was affirmed by the Second Circuit Court of Appeals.

[5] Lambert states that the same number was listed under the name "Lambert Associates" (the business name used by Nancy and Jeff Lambert), which was the primary listing for that telephone number.  "Pem-America" was a second listing, Lambert contends, which the local telephone company provided for free when Lambert Associates established telephone service at the Studio.  See Pl. Ex. B, Jeff Lambert Decl., ¶ 4.

## C. Lambert's Responsibilities As Vice President of Design

As Pem-America's Vice President of Design, Plaintiff was responsible for, among other things, designing products for Pem-America's product line, and for various managerial duties. In addition, Lambert was required by Pem-America to complete design products and related work on a schedule designed by Pem-America. During her time with Pem-America, Plaintiff designed, or participated in the design of, hundreds of textile products, including the design of certain Quilts. Lambert was required to work until she completed her assignments, and her work product was subject to Pem-America's review and revision, as well as its discretion whether to add the products she designed to Pem-America's line.

In order to complete her assignments, Lambert worked 50-60 hours per week. Plaintiff's progress and workload were monitored by Pem-America in the form of "tasks lists" that were forwarded to her by Larry Shapow ("Shapow"), the Vice President of New Product Development for Pem-America. Pem-America, by its salespeople and customers, instructed plaintiff as to the types of designs desired, assigned deadlines to projects given to her, and possessed the discretion to revise or reject designs prepared by Lambert. In addition, Lambert had limited authority to hire and fire personnel who were paid by Pem-America. People who Lambert hired were paid by checks signed by Plaintiff, but drawn on Pem-America's bank account.

In addition, Plaintiff prepared and filed applications for and on behalf of Pem-America to register Pem-America's copyrights in the Designs with the United States Copyright Office. In her capacity as Vice President of Design, Lambert personally prepared and filed with the Copyright Office, or supervised and personally approved the preparation and filing by personnel who reported to her, of more than one hundred copyright applications in the name of Pem-

America for designs created and owned by Pem-America, including many of the Designs at issue in this action. All of the copyright applications prepared or approved by Lambert identified the Defendant as the sole "author" and the subject designs as "works for hire." Consistent with this treatment of the copyright applications, Lambert also identified Pem-America as the copyright owner on the paste-ups of designs she worked on that were sent to China for the manufacture of samples.

### D. Lambert's Compensation Package

As compensation, in addition to her $130,000 annual salary, Lambert received a discretionary bonus and health insurance. Although Plaintiff denies that she received paid vacation, sick days and personal days, she does not dispute that she could take vacation days, personal days and sick days when necessary without any salary reduction. (See Def. Decl., Tab 1, (Lambert Dep. p. 614, line 3 – p. 615, line. 6)).

### E. Lambert Resigns from Pem-America

On February 15, 2003, Lambert resigned from Pem-America, as she was frustrated with the lack of communication from Pem-America's other three executives, Wang Ji, Larry Shapow and Heath Hart (Pem-America's Vice President of Sales and Marketings). In addition, Lambert felt that Pem-America excluded her from company planning and strategy meetings. (See Def. Decl., Tab ).

On February 18, 2003, Pem-America sent Lambert $10,000, by wire transfer, to the Lambert Associates' bank account. Pem-America told Plaintiff that this money would allow Lambert to start her own retirement fund, since she was ineligible to participate in Pem-America's profit-sharing plan. Lambert rejected the $10,000. By letter of resignation, Lambert

stated, "Finally, the offer of money for a retirement fund was a nice gesture, but too little, too late. Additionally, no one has contacted us about it anyway. So no thank-you." Consequently, on February 19, 2003, Pem-America reversed its wire transfer, and withdrew the prior $10,000 payment out of Lambert's account.

Following her resignation from Pem-America, Lambert accepted employment with Peking Handicrafts, Inc., a direct competitor of Pem-America. Plaintiff continues to work for Peking Handicrafts, Inc. out of the Mundelein Studio.

## III. DISCUSSION

Count I of Lambert's Amended Complaint requests that this Court enter a declaratory judgment which states that Lambert owns the Copyrights in the Designs. In Count III of her Amended Complaint, Plaintiff alleges that Defendant owes her more than $32,000 for reimbursable expenses incurred while she was working at Pem-America. [6] In Count IV of Lambert's Amended Complaint, she requests that this Court enter a declaratory judgment stating that Pem-America does not own any of the furniture, computers, tools, equipment or other property located that Pem-America claims it owns, which is presently located in Plaintiff's Studio.

Additionally, Pem-America has filed three counterclaims against Lambert. In Pem-America's First Counterclaim, it asks this Court to declare that Pem-America is the lawful owner of the copyrights to all Designs at issue. In its Second Counterclaim, Pem-America alleges that

---

[6] This Court dismissed Count II of Plaintiff's Amended Complaint, which alleged that Pem-America fraudulently obtained U.S. Copyright registrations on Quilts designed by Lambert, in a February 10, 2004 Memorandum Opinion and Order.

Lambert's Studio is furnished and equipped with furniture, computers, tools, equipment, fabrics and other personal property paid for and owned by Pem-America. Finally, in its Third Counterclaim, Pem-America alleges that subsequent to Lambert's resignation from Pem-America, Lambert used confidential information and designs created while she was employed by Pem-America for the benefit of her new employer, thereby breaching her fiduciary duty and her duty of loyalty to Pem-America.

As previously stated, Defendant requests that this Court: (1) grant Pem-America's first counterclaim for a declaratory judgment. (2) dismiss Plaintiff's first claim for a declaratory judgment; (3) grant, in part, Pem-America's second counterclaim for conversion; and (4) dismiss Plaintiff's claim for breach of contract. Each of Defendant's grounds upon which it requests summary judgment will be addressed in turn.

### A. Can This Court Determine As A Matter of Law, Who Owns The Copyrights To the Designs?

Generally, copyright ownership vests in the first instance with the person who authors the work. <u>Aymes v. Bonelli</u>, 980 F.2d 857, 860 (2d Cir. 1992). However, pursuant to 17 U.S.C. § 201, "In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and unless the parties have expressly agreed otherwise in a written agreement signed by them, owns all of the rights comprised in the copyright." <u>Langman Fabrics v. Graff California Wear, Inc.</u>, 160 F.3d 106, 110 (2d Cir. 1998). Further, a "work made for hire" is a "a work prepared by an employee within the scope of his or her employment." <u>Id</u>. (<u>citing</u> 17 U.S.C. § 101 (1994)). Consequently, it is important to determine whether Lambert was an independent contractor or employee, as that will determine

whether Plaintiff owns the copyrighted Designs (i.e., whether Lambert was an independent contractor during her business relationship with Pem-America), or whether Defendant owns the copyrighted Designs (i.e., whether Lambert was an employee of Pem-America when she created the designs).

In Community for Creative Non-Violence v. Reid, 490 U.S. 730 (1989), the Supreme Court held, for purposes of determining copyright ownership, in order to determine whether an individual is an employee or independent contractor, common law agency principles should apply. Id. at 740. In addition, the Reid Court devised thirteen factors to be considered when determining whether a hired party is an employee or independent contractor. Those thirteen factors include: (1) the hiring party's right to control the manner and means by which the product is accomplished; (2) the skill required; (3) the source of the instrumentalities and tools; (4) the location of the work; (5) the duration of the relationship between the parties; (6) whether the hiring party has the right to assign additional projects to the hired party; (7) the extent of the hired party's discretion over when and how long to work; (8) the method of payment; (9) the hired party's role in hiring and paying assistants; (10) whether the work is part of the regular business of the hiring party; (11) whether the hiring party is in the business; (12) the provision of employee benefits; and (13) the tax treatment of the hired party. The Martha Graham School and Dance Foundation, Inc. v. Martha Graham Center of Contemporary Dance, Inc., 224 F.Supp.2d 567, 591 (S.D.N.Y. 2002). No single Reid factor is dispositive. Aymes, 980 F.2d at 860. However, "[i]t does not necessarily follow that because no one factor is dispositive all factors are equally important, or indeed that all factors will have relevance in every case. The factors should not merely be tallied but should be weighed according to their significance in the case." Id. at

-10-

861.  In addition, "[t]he determination of whether a plaintiff is an employee or independent

contractor is a question of law, while the existence and degree of legal factors to be considered in

this determination are questions of fact.  Tagare v. Nynex Network Systems Company, 994

F.Supp. 149, 155 (S.D.N.Y. 1997).  As such, the Court will analyze each of the thirteen Reid

factors, in order to determine whether the Court can find, as a matter of law, that Lambert was

either an employee of Pem-America, or an independent contractor.

> *1. The Hiring Party's Right to Control the Manner and Means by Which the*
>
> *Product is Accomplished*

Pem-America contends that it had the right to control the manner in which Lambert

worked in a variety of ways.  Defendant notes that Plaintiff was required to work until she

completed her assignments, and her work product was subject to Pem-America's review and

revision, as well as its discretion whether to add products she designed to Pem-America's

product line.   While Lambert concedes that Pem-America did exercise some control over such

matters as the deadlines for her projects, and reviewed and revised her work, she contends that

Pem-America failed to engage in the type of daily review of her work necessary for employee

status.

The undisputed facts show that Pem-America exercised some control over Lambert's

work, but not daily control.  As other courts that have addressed this issue have noted,  "[a]

supervisory relationship is not necessarily inconsistent with independent contractor status."

Tagare, 994 F.Supp. at 156 (internal citations omitted).  The emphasis should be over the hiring

party's control over the hired party's daily activities.  Id. at 156 (citing Reid, 490 U.S. at 752

("[Reid] worked out of his own studio in Baltimore, making daily supervision of his activities

from Washington practicably impossible."). Consequently, the fact that Pem-America exercised some supervisory control over Lambert does not necessarily weigh in favor of employee status.

However, in evaluating the circumstances relevant to this factor, the Court must also take into account the fact that Lambert was a Vice President, a high level executive during her time with Pem-America. As Defendants note in the briefs, each factor must be weighed in context, considering what the appropriate amount of supervision for a Vice President of Design would be. (See Def. Reply Mem. of Law in Further Supp. of Mot. for Partial Summ. J., p.4). It is reasonable to expect that a Vice President would be allowed to perform her job without an excessive amount of supervision. Consequently, because Plaintiff occupied such a high position at Pem-America, this factor is indeterminate.

### 2. The Skill Required

It is undisputed that prior to her business relationship with Pem-America, Lambert was an accomplished and highly skilled designer in the home textile industry, with more than twenty years of design experience. It is also undisputed that the other three executives at Pem-America did not possess these design skills. Consequently, this factor weighs in favor of independent contractor status. (See Reid, 490 U.S. at 752 (holding that the fact that Reid was a sculptor, which is a skilled occupation, weighed in favor of independent contractor status)).

### 3. The Source of The Instrumentalities and Tools

Lambert and her husband paid all of expenses for the Studio until approximately July 1, 2000, when Pem-America began to pay the rent of the Studio, as well as other related expenses. (See Def. Decl., Tab 1, (Lambert Dep., p. 623, lines 2-7)). Pem-America continued to pay all of the expenses for the Studio, with the exception of some computer equipment, computer programs

and furniture that Lambert did not seek reimbursement for, from approximately July 2000 until her resignation on February 15, 2003. (<u>Id</u>. at lines 17-25). In her deposition testimony, Lambert testified that she would buy tools and equipment, invoice Pem-America, and be reimbursed. (<u>See</u> Def. Ex.1 (Lambert Dep., p. 624, lines 6-12)). In addition, before Lambert's business relationship with Pem-America commenced, she owned many tools and equipment necessary for her design work, including an extensive reference library, office furniture, computers, drafting boards and at least two sewing machines.

Consequently, the facts show that Lambert selected her tools, but Pem-America paid for them. As such, this factor is indeterminate. <u>See</u> <u>Langman Fabrics v. Graff Californiawear, Inc.</u>, 160 F.3d 106, 113 (2d Cir. 1988) ("The source of the artist's equipment is an indeterminate factor in this case, since the artist selected her own equipment but Langman Fabrics paid for it.").

### 4. The Location of the Work

Lambert first worked for Pem-America out of her Hawthorn Woods, Illinois, home, but eventually leased the Studio in Mundelein, Illinois. Plaintiff sometimes referred to the Studio as "Pem-America Chicago," created an email account entitled <u>nancylambert@pemamerica.com,</u> and an intranet address entitled <u>www.pemamerica.intranets.com</u>, and made letterhead, which she used without instruction from Pem-America, in the name of "Pem-America Chicago" or "Pem-America—Chicago Studio."

The fact that Lambert worked in a Studio which was located in a different state than Defendant's New York headquarters leans in favor of independent contractor. However, Plaintiff created several significant items, namely the email address, intranet site, and letterhead, in order

to associate her Studio with Pem-America's New York headquarters. Consequently, this factor weighs in favor of employee status.

### 5. The Duration of the Relationship Between the Parties

Lambert worked for Pem-America from October 1, 1999 until February 15, 2003, a duration of nearly three and one half years. Defendant asserts that this long, continuous relationship with Pem-America weighs in favor of employee status. However, Lambert asserts that while she worked for Defendant for over three years, she retained the right to work, and did work, for another textile company. Therefore, Plaintiff contends that this factor supports independent contractor status. Lambert cites Kirk v. Harter, 188 F.3d 1005, 1008 (8th Cir. 1999), where a computer programmer was deemed to be an independent contractor, although he worked for the plaintiff employer for six years, where he also worked for other companies during that six year period. However, the court in Kirk noted that the plaintiff in that case "continued to engage in consulting with other *companies*." Id. (emphasis added). While this statement by the Kirk court gives little indication as to the extent of Kirk's relationship with other employers, it does indicate that the plaintiff in Kirk engaged in consulting for multiple companies, while Lambert only worked for one company for a short time.

In addition, Plaintiff cites Aymes, 980 F.2d at 864, where the court found that a computer programmer was an independent contractor, and that the "duration of relationship" factor was inconclusive, because the programmer "did occasional work for others" during the two years he was worked for the hiring party. Id. Again, however, in Aymes, there is an emphasis on the fact that the computer programmer worked for multiple companies in addition to defendant. Further, the Aymes court noted that the computer programmer in question did not work continuously for

-14-

the defendant company.  Id.  In contrast, Lambert worked continuously for Pem-America for three and a half years.  Consequently, this factor weighs in favor of employee status.

6. *Whether The Hiring Party Has the Right to Assign Additional Projects to the Hired Party*

Neither party disputes that Pem-America, by its salespeople and customers, instructed Lambert as to the type of designs desired.  In addition, Defendant assigned deadlines to the projects given to Plaintiff, and had the ability to revise or reject designs prepared by Lambert. Plaintiff, however, contends that she was hired not just to prepare one design; she was hired to design products for Pem-America's entire product line.  Consequently, Plaintiff contends, each individual design should not be considered a separate "project."

Other courts have noted that the ability to assign additional projects to a hired party "is fairly strong evidence [of employee status], since independent contractors are typically hired only for particular projects."  Aymes, 980 F.2d at 863.   Consequently, though Lambert attempts to group all of her designs into one "project," the fact that Pem-America had the ability to assign Lambert different projects weighs in favor of employee status.

Though this factor does weigh in favor of employee status, as the Aymes court noted, the ability to assign other projects to a hired party is not entirely inconsistent with independent contractor status, particularly if a person was hired to address a particular need of a company. Aymes, 980 F.2d at 863.  Clearly, Lambert was hired for the particular purpose of designing textiles for Pem-America. Consequently, while this factor weighs in favor of employee status, it will have only slight significance in the final analysis of whether Lambert was an employee or independent contractor.

*7. The Extent of the Hired Party's Discretion Over When and How Long to Work*

Lambert contends that she had complete control over her work schedule, with no input or directions from Pem-America. Pem-America, however, contends that Plaintiff, in her own deposition testimony, admits that she had to work long hours in order to fulfill the deadlines imposed by Pem-America. (See Def. Decl., Tab1 (Lambert Dep., p. 617, lines 4-25)).

The fact that Plaintiff had to meet certain deadlines is not inconsistent with independent contractor status. It is both reasonable and likely that both employees and independent contractors will need to meet certain deadlines in order to fulfill their obligations to the hiring party. However, Plaintiff was a high level executive at Pem-America, and worked in an office hundreds of miles from Pem-America's headquarters. Therefore, it is likely that she would have significant control over her work schedule, as long as she met all necessary deadlines. Consequently, this factor is indeterminate.

*8. The Method of Payment*

Lambert was paid twice a month, and was paid the same amount every month, regardless of how many hours she worked, or how many designs she created. Each pay period, Lambert was paid by a wire transfer that was sent directly to Lambert Associates. In the first two months of working for Pem-America, Plaintiff was paid only after submitting invoices to Pem-America. After a few months, however, Wang Ji expressed to Lambert that she no longer needed to submit invoices.

The fact that Plaintiff was paid the same amount each month, regardless of the number of hours worked or the number of designs created, weighs in favor of employee status. However, the fact that during the first few months of her employment, Lambert had to submit invoices prior

to receiving a paycheck, weighs in favor of independent contractor status.  See Tagare , 994 F.Supp. at 158 (finding that method of payment supported independent contractor status, even though plaintiff consultant was paid monthly, when plaintiff consultant had to submit invoices prior to being paid).  However, because Lambert was only required to submit invoices in her first few months of employment with Pem-America, the method of payment weighs in favor of employee status. Further, the fact that Plaintiff was paid by wire transfers is of little or no significance, because Defendant commenced that practice only after Lambert specifically requested that Defendant pay her by that method.  (See Def. Decl., Tab 21 (Lambert Dep., p. 96, line 2- p. 97, line 22)).  Consequently, the evidence submitted concerning Plaintiff's method of payment weighs in favor of employee status.

### 9. The Hired Party's Role In Hiring And Paying Assistants

It is undisputed that during her tenure with Pem-America, Lambert had the limited authority to, and did, hire and fire personnel who were paid by Pem-America.  The personnel hired by Lambert to work in the Studio were paid by checks signed by Plaintiff, but drawn on a Pem-America bank account.

The Parties dispute whether Lambert had to obtain Wang Ji's approval prior to hiring assistants.  Defendant contends that Lambert's ability to hire and fire personnel was limited by and subject to Wang Ji's approval.  Lambert, however, asserts that she conducted all interviews and made all hiring decisions herself, without a need to obtain Wang Ji's approval.  (See Lambert Ex. A, Nancy Lambert Decl., ¶ 20).

At this stage of the proceedings, when all facts must be construed in the light most favorable to Lambert, the non-moving party, the Court is not able to determine, as a matter of

law, whether this factor leans in favor of employee or independent contractor status. If Plaintiff was able to hire assistants without prior approval, this would weigh in favor of independent contractor status. See Aymes, 980 F.2d at 861 ("Having the authority to hire assistants, however, might have great probative value where the individual claiming to be an independent contractor does exercise authority to enlist assistants without prior approval of the party that hired him"). In contrast, if the Plaintiff had to receive approval prior to hiring assistants, then the evidence would lean in favor of employee status. See Tagare, 994 F.Supp. at 158. Consequently, because there is credible evidence favoring both Plaintiff and Defendant's respective positions on this issue, this factor is indeterminate.

### 10. Whether The Work Is Part Of The Regular Business Of The Hiring Party

"The purpose of this factor is to determine whether the hired party is performing tasks that directly relate to the objective of the hiring party's business." Aymes, 980 F.2d at 863, which will favor the hired party being found an employee. It is undisputed that Pem-America is in the business of designing and importing home textiles. It is also undisputed that Lambert was hired as Pem-America's Vice-President of Design, and Plaintiff was responsible for, among other things, designing products for Pem-America's product line. Consequently, because the work that Lambert did was in the regular business of Pem-America, this factor leans in favor of employee status.

### 11. Whether The Hiring Party Is In The Business

The analysis for this factor is almost identical to that of the preceding factor, and it has already been established that Pem-America is in the textile design business; as such, this factor weighs in favor of employee status. However, it should be noted that this "is a factor that will

always have very little weight in this analysis." <u>Aymes</u>, 980 F.2d at 863.  Consequently, while this factor weighs in favor of employee status, it has little weight in the final analysis.

### 12.  The Provision Of Employee Benefits

As compensation, in addition to her $130,000 annual salary, Lambert received a discretionary bonus and health insurance.  Although Plaintiff denies that she received paid vacation days, sick days and personal days, she does not dispute that she could take vacation days, personal days and sick days when necessary, without any salary reduction.  (<u>See</u> Def. Decl., Tab 1 (Lambert Dep.,  p. 614, line 3 – p. 615, line 6)).

Plaintiff contends that she did not receive the same benefits as other employees, and states that she did not receive a set number of vacation, sick and personal day,s as other employees did.  However, Lambert does not dispute that she could take vacation, personal and sick days as necessary without any salary reduction.  Consequently, the Court finds that the undisputed evidence clearly shows that Lambert did receive benefits while working for Pem-America.  Therefore, this factor weighs in favor of employee status.

### 13. The Tax Treatment Of The Hired Party

It is undisputed that Plaintiff was paid on an Internal Revenue Service "Form 1099," which is typically used for independent contractors.  From time to time during her employment with Pem-America, Lambert would request that she be paid on a "W-2" (the form generally used for employees), as opposed to a 1099.  However, to compensate for the tax difference, Pem-America paid Lambert an additional sum of money.

This is one of the most important factors in the analysis of Plaintiff's status. "The parties' tax treatment of the employment relationship is highly indicative, and may even constitute a

'virtual admission' of the hired party's status." Tagare, 994 F.Supp. at 155 (citing Aymes, 980 F.2d at 862). For example, the Aymes court noted that, "[t]he failure of [the hiring party] to extend [the hired party] any employment benefits or to pay any of his payroll taxes is highly indicative that [the hired party] was considered an outside independent contractor by [the hired party]." Aymes, 980 F.2d at 861 (2d Cir. 1992).

Pem-America does not dispute that the fact that Lambert was paid on a 1099 is indicative of independent contractor status. However, Defendants asserts that because Lambert was compensated with additional amounts of money, and because she constantly expressed her desire to be paid on a W-2 form, this factor is still indicative of employee status. However, Wang Ji, Pem-America's President, told Lambert that she was paid on a 1099 so Pem-America would not have to pay Illinois corporate taxes. While Pem-America does not find this fact material to Plaintiff's status, it is highly indicative of her status, as well as Defendant's motives. Clearly, Defendant benefitted from paying Lambert as an independent contractor, in that it avoided paying Illinois corporate taxes for that time period in Illinois.[7] As a consequence, this factor weighs strongly in favor of independent contractor status.

### 14. Other Relevant Factors

#### a. Copyright Registration Forms

Finally, there are several other relevant factors, that, while they do not fit neatly into the thirteen factor Reid test, are necessary to analyze in order to determine whether Lambert was an

---

[7]See Aymes, 980 F.2d at 862. ("[The hiring party] benefitted from treating the [hired party] like an independent contractor when it came to providing benefits and paying a percentage of the payroll taxes.[The hiring party] should not in one context be able to claim that [the hired party] was an independent contractor and ten years later deny him that status to avoid a copyright infringement suit." ).

employee or independent contractor.  First, Lambert personally prepared and filed with the

Copyright Office, or supervised and personally approved the preparation and filing by personnel

who reported to her, of more than one hundred copyright applications in the name of Pem-

America for designs created and owned by Pem-America, including many of the Designs at issue

in this action. All of the copyright applications prepared or approved by Lambert identified the

Defendant as the sole "author" and the subject designs as "works for hire."  Consistent with this

treatment of the copyright applications, Lambert also identified Pem-America as the copyright

owner on the paste-ups of designs she worked on that were sent to China for the manufacture of

samples.  When Plaintiff filled out these copyright applications, she was familiar with the

copyright application form, and knew the significance of the information requested.

"Under the copyright laws, the registration of a copyright certificate constitutes prima

facie evidence of the validity of a copyright in a judicial proceeding commenced within five years

of the copyright's first publication." Lamps Plus, Inc. v. Seattle Lighting Fixture Co., 345 F.3d

1140, 1144 (9th Cir. 2003) (internal citations omitted).  However, the presumption of the validity

of a registered copyright may be overcome by the offer of some proof to rebut that presumption

of validity.  Id. at 1145-46 (internal citations and quotations omitted).  Plaintiff now claims that

she filled out the copyright forms under duress, thereby rebutting the presumption of the validity

of the copyright registration forms.  Lambert asserts that her initial inclination was to list herself

as the author of the Designs she created, but she was instructed by Larry Shapow, another Pem-

America Vice President, to list Pem-America instead and describe the designs as "works for

hire."  According to Plaintiff, when she protested, Shapow consulted with Pem-America's

attorney, Paul Levenson.  Subsequently, Shapow told Lambert that Pem-America should be listed

as the author because if there was ever any copyright infringement suit, Lambert would be sued individually and be held personally liable.  Lambert contends that it was only after she was told this information that she decided to acquiesce and identify the designs as "works for hire" with Pem-America as the author.

Plaintiff's duress defense is lacking in any type of legal or factual basis.  In order to demonstrate duress, a claimant must show: (1) she involuntarily accepted the terms of another; (2) the circumstances permitted no other alternative; and (3) said circumstances were the result of coercive acts of the other party.  Commonwealth Edison Co. v. Allis-Chambers Mfg. Co., 245 F. Supp. 889, 898 (N.D. Ill. 1965).   The fact that Pem-America's attorney may have advised Shapow on how Lambert should fill out the copyright registration forms does not come close to any type of duress.  The facts as presented by Plaintiff fail to show any type of coercion.  Further, there were several alternative options Lambert could have taken: for example, she could have talked directly to the Wang Ji, the president of the company and, advised him of her desire to be listed as the author.   Plaintiff's regret for filling out the copyright registration forms in the manner she did, particularly when she knew the consequences of her actions, does not amount to duress.  Consequently, the fact that Lambert filled out copyright registration forms listing Pem-America as the author and designating the designs as "works for hire" weighs strongly in favor of employee status.

### b. The "Employment" Contract

_____As previously noted, the Parties' relationship was governed by the "Employment Contract for Pem America," which was drafted by Lambert.  (<u>Def</u>. Decl, Tab 2).  Some of the language within this contract is indicative of employee, rather than independent contractor, status.[8]

 For example, Lambert notes that her position is "full time and permanent."  This language is indicative of full time, employee status.  Additionally, Lambert notes that she, "will receive all of the benefits granted to employees of the company."  Again, this language indicates employee status, for Plaintiff groups herself with Pem-America's other employees.

### _15. Final Analysis of All Factors_

_____At this stage of the proceedings, the Court cannot determine, as a matter of law, whether Lambert is an employee or independent contractor.  The strongest factor weighing in favor of independent contractor status is the fact that Plaintiff was paid on a Form 1099 as opposed to a W-2. Undoubtedly, this factor is quite significant, and has a great deal of weight.  In addition, the Court strongly disapproves of Pem-America's decision to pay Lambert on a Form 1099 to avoid paying Illinois corporate taxes.   However, there are factors that support employee status.  The most significant factors in this analysis include that Plaintiff: (1) held the title of Vice President of Design, one of the top four executives of Pem-America; (2) created an email account, intranet site and letterhead incorporating the name "Pem-America"; (3) referred to the Studio as "Pem-America Chicago"; (4) worked with Pem-America for three and one half years; (5) received an

---

[8] "[A]lthough an individual's employment status is not determined solely by the label used in the hiring contract, courts.... have considered contractual language as one factor among many in determining employment status."  <u>Tagare</u>, 994 F.Supp. at 149 (internal citations omitted).

annual salary; (6) received health insurance, vacation days, sick days and personal days; and (7) filled out the copyright registration forms designating Pem-America as author and designating the Designs as "works for hire."   In number, there are many more factors indicating employee status, and these factors carry significant weight.   However, the weight of the evidence indicating that Pem-America paid Lambert on a Form 1099 is so strong, that this Court cannot, as a matter of law, determine whether Lambert was an employee or independent contractor.   Consequently, this claim will proceed to trial.[9]

### B.  Pem-America's Motion for Summary Judgment On Its Conversion Claim

Following her resignation from Pem-America on February 15, 2003, Lambert accepted employment by a direct competitor of Pem-America, Peking Handicrafts, Inc., and commenced work for Peking Handicrafts out of the Mundelein, Illinois Studio.  Though the Studio contained items purchased by Plaintiff prior to October 1, 1999, the Studio was also furnished and equipped with furniture, computer, tools equipment, fabric and other personal property paid for by Pem-America.  The items that Pem-America either purchased or reimbursed Lambert for include extensive computer hardware and software, a digital camera, a sewing machine, and a custom made shipping station.  Plaintiff does not dispute that Pem-America directly paid for the computer hardware, software and digital camera.  In addition, Lambert does not dispute that Pem-America reimbursed her for a sewing machine.  In addition, the invoice for the shipping station indicates that the cost for construction of the shipping table was charged to Pem-America.

---

[9] Plaintiff was not allowed to participate in Pem-America's profit-sharing plan. Defendant notes that it compensated Lambert with additional money since she could not participate in the profit-sharing plan.  However, it is not clear why the Plaintiff was not able to participate in the profit-sharing plan.  The court cannot speculate as to whether the basis for that decision would (or would not) shed light on the question of her status as contractor or employee.

Finally, Lambert does not dispute that she is still in possession of the property, which despite repeated demand from Pem-America, Lambert has failed and refused to account for and return to Defendant. The property, at the point of purchase, was valued at approximately $12,000. (See Def. Decl., Tabs 15-17).

In defense of retaining the property, Lambert urges that she—not Pem-America—owned the property when she bought it, prior to reimbursement by Pem-America. Lambert asserts that there was no written agreement concerning ownership of the property, and the Parties' "Employment Contract" is silent on the issue of ownership. Further, Lambert contends, even if Pem-America were able to prove that it owned the property, it would still not be entitled to summary judgment, because there has been no evidence submitted concerning damages.

Consequently, Plaintiff has admitted that Pem-America—in some form or fashion—has paid for all of the items comprising its second counterclaim. "The essence of conversion is the wrongful deprivation of one who has a right to the immediate possession of the object unlawfully held." Horbach v. Kaczmarek, 288 F.3d 969, 978 (7th Cir. 2002) (internal citations omitted). It must be shown that Pem-America had an immediate right to possession of the property and that Plaintiff interfered with that right to possession. Id.

Although the Parties' agreement is silent on this property, Pem-America clearly owns this property. Plaintiff's use of this property was to be associated with her employment with Pem-America. Plaintiff no longer works for Pem-America. Consequently, she must return the property. Even though Pem-America is entitled to the property, or the fair market value of the property, that value has yet to be determined. See Ruiz v. Wolf, 621 N.E.2d 67, 69 (Ill. App. Ct. 1993) ("the measure of damages for conversion is the fair market value at the time of conversion,

and it is the plaintiff's burden to show a reasonable basis to determine the value of the item converted."). Consequently, the amount of damages must be determined. Consequently, Pem-America's motion for summary judgment on its second counterclaim is denied, however, its right to the property, or value thereof, is deemed established.

### C. Pem-America's Motion For Summary Judgment on Lambert's Breach of Contract Claim

In her claim for breach of contract, Plaintiff seeks to recover: (1) a ten thousand dollar bonus; and (2) expenditures, dating back to January 2002, that Lambert claims she should have been reimbursed for. Pem-America contends that it is entitled to summary judgment with respect to both grounds for Lambert's breach of contract claim. Each ground will be discussed in turn.

#### 1. The 10,000 Bonus

On February 18, 2003, Pem-America sent $10,000, by wire transfer, to the Lambert Associates' bank account. Pem-America told Lambert that this money was for her to start hew own retirement plan, since she was ineligible to participate in Pem-America's profit-sharing plan. However, in her resignation letter, Lambert rejected the offer of $10,000. In her letter, Lambert stated: "Finally, the offer of money for a retirement fund was a nice gesture, but too little, too late. Additionally, no one has contacted us about it anyway. So no thank-you." See Def. Decl, Tab 4. Consequently, on February 19, 2003, Pem-America reversed its wire transfer, and withdrew the $10,000 payment out of Lambert's account

Plaintiff urges that the language within her February 15, 2003 resignation letter should not be seen as a waiver of her right to this money. Clearly, however, Plaintiff did reject the $10,000 offer, thereby waiving her right to attempt to recover that money now as part of this

cause of action.  Plaintiff may now regret the language she used in her resignation letter that rejected the offer of the $10,000, but that regret will not override her clear refusal to accept that money.   Consequently, Defendant's motion to dismiss this breach of contract claim is granted.

### 2. Plaintiff's Expenditures

Lambert seeks reimbursement, pursuant to the Employment Contract, of expenses dating back to January 2002. Plaintiff notes that her Employment Contract provides that "business expenses approved by Waug (sic) Ji will be submitted monthly, on an expense report, and paid by the company." See Def. Decl., Tab 2, § E.  However, it is undisputed that Lambert, during the course of her employment with Pem-America, sometimes submitted expenses many months after they incurred , and Defendant consistently paid these late-submitted expense without comment or question.  Therefore, Lambert contends, Pem-America waived the condition that expenses be submitted in the month in which they incurred, since it failed to enforce that provision during the course of the Parties' business relationship.  See In re Liquidation of Inter-America Ins. Co. of Illinois, 768 N.E.2d 182, 193 (Ill.  App. Ct. 2002) ("waiver may be established by conduct indicating that strict compliance with the contractual provision will not be required").

The evidentiary record on this issue is not sufficiently established for the Court to find, as a matter of law, that Plaintiff is not entitled to reimbursement for these expenditures.  It may very well be true that Defendant waived the requirement that all expenses be submitted in the month that they incurred. However, Plaintiff failed to notify Pem-America of these incurred expenses, until well after her resignation (in fact, Pem-America did not learn of these expenditures until Plaintiff's Fed. R. Civ. P. 26 disclosures in June 2004).  Consequently, there is

a genuine issue of material fact concerning whether Plaintiff is entitled to reimbursement for these expenses.

## IV.  CONCLUSION

For the foregoing reasons, Defendant's motion for partial summary judgment is GRANTED in part and DENIED in part.  Pem-America's motion for summary judgment on the issue of copyright ownership is denied.  Pem-America's motion for summary judgment on its second counterclaim is denied; however, its right to the property, or value thereof, is deemed established. Pem-America's motion for summary judgment on Lambert's breach of contract claim is granted in part and denied in part.

Enter:

/s/ David H. Coar
_____
David H. Coar
United States District Judge

Dated: **January 21, 2005**